**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-22-01651-001-TUC-RM (DTF) |
| Plaintiff, | **ORDER** |
| v. | |
| William Joel Serna, | |
| Defendant. | |

Pending before the Court are (1) Defendant Serna's First Motion to Suppress 404(b) Evidence (Doc. 58)[1]; (2) Defendant's First Motion to Suppress Evidence (Reasonable Suspicion) (Doc. 59); and (3) Defendant's Motion to Sever Count 2 (Doc. 67). For the following reasons, the Motion to Suppress Evidence (Reasonable Suspicion) and the Motion to Suppress 404(b) Evidence will be granted, and the Motion to Sever Count 2 denied as moot.

**I.     Background[2]**

Defendant was indicted on July 27, 2022 on four counts of Transportation of Illegal Aliens for Profit and one count of Conspiracy to Transport Illegal Aliens for

---

[1] At the evidentiary hearing (EH) on January 11, 2023, defense counsel orally converted the Motion to a Motion to Suppress, since the evidence contained therein is no longer 404(b) evidence but substantive evidence against the Defendant. (EH at 1-2, 20-21.)
[2] At the EH, Agent Owens and Officer Resendiz testified to the facts set forth herein. The relevant portions of the hearing transcript will be cited to as "EH." The briefing also contains relevant factual background of the events underlying the Indictment, as set forth herein.

Profit. (Doc. 23.) On January 4, 2023, the Government filed a Superseding Indictment adding one count of Possession of a Firearm and Ammunition by a Convicted Felon. (Doc. 65.) The Indictment is based on the following events, which the parties do not substantially dispute.

On May 26, 2022, Border Patrol Agent Charles Owens ("Agent Owens") stopped the Defendant around 7:30 a.m. while the Defendant was traveling on State Route 90 near Huachuca City in southern Arizona. (Doc. 62.; EH at 9-12.) The Defendant was driving a blue Volkswagen Tiguan. (*Id*. at 2.; EH at 14.) Agent Owens noted the driver was "clutching" the wheel and did not look at Agent Owens as he passed. (*Id*.; EH at 12-13, 30-36.) However, Agent Owens did see the driver's eyes opening wide. (EH at 32, 33.) Agent Owens noted that the vehicle was dirty, as though it had been out in the desert, had scratches along the sides, and had a temporary registration tag registered to the Phoenix area. (*Id*.; EH at 14-18, 37-39, 42-43.) As Agent Owens followed the vehicle, he saw it cross the centerline of the road, as though the driver was observing him in the rearview mirror, and then switch lanes, making a "hard swerve" into the right lane. (*Id*.; EH at 16-17, 48-50.) Agent Owens testified that, after following the vehicle for approximately seven miles, he initiated a traffic stop based on his suspicion that the vehicle was involved in alien smuggling. (*Id*.; EH at 18-19.) He testified that his suspicion was based on the dirt and scratches on the car, the driver's "nervous" appearance and demeanor, the driver's lane change as Owens followed him, the temporary registration tag, the early morning hour, and the location of the vehicle in a known human trafficking area. (*Id*. at 3.; EH at 10-19, 53-54.) However, although the area is known for trafficking, it is well-traveled by hundreds, if not thousands, of people every day. (EH at 27, 28.)

Upon contacting the Defendant and the vehicle's three occupants, Agent Owens asked the two Hispanic males seated in the backseat their citizenship status. (*Id*. at 3.; EH at 19-20.) Both stated that they were Mexican citizens illegally in the United States. (*Id*.) Defendant and the other occupants were taken into custody; Border Patrol agents found narcotics on Defendant's person and in the vehicle and a loaded pistol underneath the

driver's seat. (*Id*.; EH at 20.) After reading Defendant his Miranda rights, Owens asked him why he was smuggling non-citizens, and Defendant responded, "I am homeless and need the money." (*Id*.; EH at 21.) The third occupant, who was a U.S. citizen, stated that she and Defendant had left Glendale at 1:00 that morning to pick up the aliens, who had come "out of the bush." (*Id*.) Border Patrol did not arrest the Defendant, and the gun and drug evidence were turned over to the Department of Public Safety (DPS). (*Id*.)

On July 2, 2022, Douglas Police Officer Javier Resendiz ("Officer Resendiz" or "Resendiz") was on routine patrol in Douglas, Arizona, a town on the border of Arizona and Mexico, when he observed Defendant driving a white Volkswagen hatchback with California plates. (Doc. 63 at 2; EH at 59-60.) Officer Resendiz testified that he had observed the same vehicle driving in and near Douglas on three occasions in the weeks prior to July 2. (*Id*.; EH at 60-63.) On one of those prior occasions he ran the vehicle's license plate, which returned to a car rental company, but did not contact the vehicle. (EH at 60.)

Due to having seen the vehicle on prior occasions, Officer Resendiz decided to follow it on July 2. (*Id*.; EH at 65.) On that day, Resendiz observed the vehicle driving through Douglas at 4:30 a.m. with several occupants. (*Id*. at 2-3.; EH at 64-65.) Officer Resendiz saw the Volkswagen turn into a Speedway gas station and park next to a gas pump without any prompting or indication from Officer Resendiz. (*Id*.; EH at 67-68.) The parties agree that Resendiz did not initiate a stop and that Defendant pulled into the gas station of his own accord. Officer Resendiz testified that he did not observe anything about the behavior of the vehicle that would have constituted an infraction for which he could have initiated a traffic stop. (EH at 88-89.)

Officer Resendiz then parked behind Defendant at another pump, facing the opposite direction. (*Id*.; EH at 72.) The officer's vehicle did not block Defendant's vehicle from leaving. (*Id*.; EH at 72.) Resendiz approached Defendant's vehicle and initiated a conversation with him. (*Id*.; EH at 72-74.) Resendiz noticed that the vehicle's four occupants were Hispanic males dressed in dark clothing who did not acknowledge

Resendiz's presence. (*Id*.; EH at 73, 75.) Officer Resendiz requested Border Patrol assistance through dispatch. (*Id*.; EH at 76.)[3]

Officer Resendiz conversed with Defendant about Defendant's business and his family members in Mexico. (*Id*.; EH at 74.) When Resendiz attempted to converse with the vehicle's occupants, they did not respond. (*Id*.; EH at 75.) Shortly into the conversation, Resendiz asked to see Defendant's driver's license in order to confirm his identity and "let dispatch know who [he] was talking to." (*Id*. at 3-4.; EH at 76-77.) Defendant voluntarily provided his license. (*Id*. at 4.) Officer Resendiz ran Defendant's license through dispatch at 4:41 a.m. and was informed that it was cancelled. (*Id*.; EH at 78.) Resendiz testified that he did not recall whether he stepped away from Defendant's vehicle while making the records check call to dispatch. (EH at 77.)

Resendiz's testimony was unclear as to exactly when or whether he returned Defendant's driver's license to him. (EH at 91-99.) He did testify that Defendant could not drive away without his license and that he could have asked for it. (EH at 92.) Officer Resendiz testified that he returned Defendant's license to him but did not remember actually doing so. (EH at 93.) Resendiz testified that he would have allowed Defendant to drive away with a cancelled license, stating, "It's his choice." (EH at 91-93.) However, he also testified that Defendant could not technically leave without his license. (EH at 99.) Resendiz testified that he would have had no reason to retain the license, despite it being cancelled. (EH at 93.) He testified that he could have issued Defendant a citation for driving with a cancelled license but did not take steps to do so. (EH at 95-96.) Whether Resendiz returned Defendant's license was not included in his police report. (EH at 93-94.)

When Officer Resendiz informed Defendant that his license was cancelled, Defendant became argumentative. (*Id*.; EH at 78-79.) Defendant insisted that his license was not cancelled, and proceeded to call Douglas Police dispatch, as well as Phoenix Police dispatch, in an effort to confirm the validity of the license. (*Id*.; EH at 78.) Officer

---

[3] Resendiz was unable to provide the exact time he requested Border Patrol assistance, but dispatch records indicate that Border Patrol was en route at 4:43 a.m. (Doc. 63 at 3.)

- 4 -

Resendiz asked the vehicle's occupants if any of them had a license and could drive the vehicle. (*Id*.; EH at 80.) Defendant stated that none of them had licenses. (*Id*.; EH at 80.) At approximately 5:00 a.m., the first Border Patrol agent, Tyler Jones, arrived. (*Id*.; EH at 80-81.) Agent Jones asked the vehicle's occupants their citizenship status, and they responded that they were Mexican citizens illegally in the United States. (*Id*.) Defendant asked to talk to Jones's supervisor. (*Id*.) Border Patrol Supervisor Art Nuila then arrived. (*Id*.) Agent Nuila then asked the passengers about their citizenship status; Defendant stated that because the passengers had passports, Nuila could not talk to them. (*Id*. at 4-5.) Agent Nuila confirmed with the passengers that they were in the United States illegally. (*Id*. at 5.) Nuila then asked Defendant to exit his vehicle and informed him he was being arrested for alien smuggling. (*Id*.) Defendant continued to insist that the passengers had passports. (*Id*.)

**II.     Motion to Suppress Evidence from May 26, 2022 Stop**

Defendant moves to suppress all evidence obtained as a result of the May 26, 2022 stop by Agent Owens. (Doc. 58.) Defendant contends that the stop was an illegal seizure in violation of the Fourth Amendment because it was not supported by reasonable suspicion. (*Id*. at 2-4.) Defendant argues that there was no particularized and objective basis for stopping him because (1) State Route 90 is a heavily trafficked road that is not near the border; (2) nothing about Defendant's driving behavior, including the lack of eye contact and the lane switch, was erratic or evasive; and (3) neither the dirt on the vehicle, the type of vehicle, nor the number of occupants, supported reasonable suspicion for alien smuggling. (*Id*. at 4-5.) Defendant argues that, even viewing the circumstances with deference to Agent Owens' interpretation of the facts, his inferences were not objectively reasonable and did not rise to reasonable suspicion. (*Id*. at 5.)

In response, the Government contends that the May 26 stop was supported by reasonable suspicion. (Doc. 62.) The Government contends that (1) the location of the stop, on State Route 90 near Huachuca City, is in a corridor known for alien smuggling, and the vehicle was near the border ; (2) the vehicle's occupants' behavior of not looking

at Agent Owens, the erratic driving behavior, and the dirt on the vehicle all support reasonable suspicion; and (3) the vehicle's temporary tag registered to Glendale, and the high percentage of vehicles engaged in alien smuggling that are registered to the Phoenix metropolitan area, supports reasonable suspicion. (*Id*. at 4-6.)

### A. Applicable Law

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citations omitted). "Because the 'balance between the public interest and the individual's right to personal security,' tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity '"may be afoot[.]"' *Id*. (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 878 (1975)); *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Reasonable suspicion is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Valdes-Vega*, 783 F.3d 1074, 1078 (9th Cir. 2013.)

"When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (citing *Cortez*, 449 U.S. at 417-18). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id*. "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause[.]" *Id*. at 274. "[I]n justifying [a] particular intrusion the police officer must be able to point to specific and

articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

For stops related to suspected border crimes, the Ninth Circuit has set forth a non-determinative list of factors for courts to consider in determining whether the totality of the circumstances supports reasonable suspicion: (1) the characteristics of the area where the vehicle is encountered; (2) the vehicle's proximity to the border; (3) traffic patterns and experience with previous illegal border crossings in the area; (4) whether certain types of vehicles are known to transport undocumented persons; (5) erratic driving behavior or attempts to evade law enforcement; and (6) whether the vehicle appears to be heavily loaded or have an unusual number or passengers. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). "[E]ven when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion." *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). Courts may not adopt a "'divide-and-conquer analysis'" by looking at each factor in isolation and according it no weight if it is susceptible to an innocent explanation." *Id.* at 1088. Not every factor must be present in every case to justify reasonable suspicion, and "facts must be filtered through the lens of the agents' training and experience." *Valdes-Vega*, 738 F.3d at 1079. "If the initial stop was unconstitutional, then all evidence seized as a result of the stop must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (internal citation omitted).

**B. Analysis**

The Court has reviewed in detail the parties' briefing on this matter, the testimony and arguments of the January 11, 2023 evidentiary hearing, and the relevant case law. Having considered the totality of the circumstances of the May 26, 2022 stop, the Court finds that the evidence obtained as a result of the stop of Defendant on State Route 90 must be suppressed because the stop was not supported by reasonable suspicion.

State Route 90 is a heavily trafficked road that connects the cities of Sierra Vista and Huachuca City to Interstate 10, and a vehicle travelling on this road cannot be said to

1 be in an area known for alien smuggling. Nor was the location of Defendant's vehicle
2 approximately 30-40 miles from the border "in proximity" to the border. The behavior of
3 the occupants and the driver of not looking at, widening their eyes, or failing to make eye
4 contact with, Agent Owens, cannot be said to add to the reasonable suspicion analysis in
5 any way. Likewise with the driver's lane change as Agent Owens came up behind him;
6 there is nothing suspicious about an individual viewing an approaching vehicle in his
7 rearview mirror and then switching to the right lane to allow it to pass. The dirt on the
8 vehicle also does not add to the reasonable suspicion analysis, as a vehicle in an area
9 dominated by desert and unpaved roads could be dirty for any number of reasons
10 unrelated to smuggling undocumented persons. Lastly, the vehicle's temporary tag
11 registered to Glendale is not unusual in southern Arizona and does not add to the
12 reasonable suspicion analysis to compel the Court to reach a different conclusion.
13 Accordingly, viewing the totality of the circumstances surrounding the May 26 stop, the
14 Court finds that it was not supported by a particularized and objective basis for
15 suspecting Serna of criminal activity, and that the evidence obtained therefrom must be
16 suppressed.

### III. Motion to Suppress Evidence (Reasonable Suspicion)

Defendant moves to suppress all evidence obtained as a result of what he characterizes as Officer Resendiz's unlawful detention of Defendant on July 2. (Doc. 59.) Defendant argues that, once Officer Resendiz took his driver's license and ran a records check, he was not free to leave, and a detention occurred that was not supported by reasonable suspicion. (*Id.*) Defendant concedes that the initial encounter was consensual. (*Id.*) However, he contends that, when Officer Resendiz retained control of his driver's license and ran a records check, he was no longer free to depart and thus that act converted the initially consensual encounter into a detention or arrest within the meaning of the Fourth Amendment. (*Id.*) Defendant cites to cases finding that an officer's retention of an individual's documents and/or identification, without a specific reason for doing so, constitutes a seizure. (*Id.*) Defendant argues that when Officer Resendiz took

possession of Defendant's driver's license for the alleged purpose of confirming his identity, kept the license while obtaining a records check from dispatch, and then retained the license for an unknown or indefinite period of time, a reasonable person would not believe he was free to depart. (*Id*.)

Defendant further argues that no reasonable suspicion supported the detention that occurred when Officer Resendiz ran a records check on Defendant's license. (*Id*.) Defendant argues that Officer Resendiz's observations that the Defendant turned into the Speedway gas station, that he appeared nervous, and that the vehicle contained four passengers who did not make eye contact or communicate, collectively do not provide a particularized and objective basis for reasonable suspicion of criminal activity. (*Id*.) Defendant argues that, had Officer Resendiz had reasonable suspicion leading up to the consensual encounter at the gas station, he would have conducted a traffic stop. (*Id*.) However, he never did so, nor did he place Defendant under arrest. (*Id*.) Moreover, Resendiz testified that he lacked reasonable suspicion to initiate a traffic stop. (*Id*.) Defendant further contends that his apparent "nervousness" and presence at the gas station in Douglas are not sufficient to support reasonable suspicion, because such a finding would subject nearly any driver in Douglas to possible detention for criminal activity. (*Id*.)

The Government filed a Response in opposition to the Motion to Suppress. (Doc. 63.) The Government contends that (1) Officer Resendiz had reasonable suspicion to detain Defendant pending Border Patrol's arrival so that his asking to see and retaining Defendant's driver's license was inconsequential, and (2) Defendant was not in fact detained or arrested until Border Patrol arrived and Agent Nuila told Defendant he was being arrested. (*Id*. at 5.)

First, the Government argues that Resendiz had reasonable suspicion to detain Defendant upon contact based on (1) the vehicle's presence in an area well-known for alien smuggling; (2) the vehicle's California plates and its registration as a rental car; (3) Resendiz's observations of the vehicle in Douglas prior to July 2; (4) the early morning

hour;[4] (5) the number of passengers in the vehicle and their appearance and attire; and (6) Defendant's "abrupt" turn into the Speedway gas station. (*Id*. at 6-7.) The Government argues that, because Officer Resendiz could have detained Defendant but did not, and instead kept the encounter consensual, there was no constitutional violation in running Defendant's driver's license. (*Id*. at 8.) The Government contends that, because Resendiz made no show of force or exercise of authority to indicate to Defendant that he was not free to leave, no detention occurred. (*Id*. at 8-9.) The Government argues that relevant precedent supports a finding that Resendiz was permitted to request, but not require, Defendant's identification without converting the consensual encounter into a detention. (*Id*. at 10.) The Government notes that, in the cases cited by Defendant, the police officer took an extra step of indicating to the defendants that they were not free to leave by showing authority or force or explicitly instructing the defendants to remain. (*Id*. at 10-11.) The Government contends that because Resendiz made no such show of force or authority, his request for and retention of Defendant's license, and running a records check, did not amount to a detention. (*Id*.)

### A. Applicable Law

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). An encounter does "not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Id.*; *see also Terry*, 392 U.S. at 19, n.16. "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 434–35 (citing *INS v. Delgado*, 466 U.S. 210, 216 (1984) (internal

---

[4] Officer Resendiz testified at the evidentiary hearing that the early morning hour was "irrelevant" to his decision to follow Defendant's vehicle.

citations omitted).

"Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Delgado*, 466 U.S. at 215 (internal citation omitted). "[T]he protection against unreasonable seizures also extends to 'seizures that involve only a brief detention short of traditional arrest.'" *Id*. (citing *Brignoni–Ponce*, 422 U.S. at 878). "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id*. (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). An individual "may not be detained *even momentarily* without reasonable, objective grounds for doing so[.]" *Florida v. Royer*, 460 U.S. 491, 498 (1983) (emphasis added).

"When a law enforcement official retains control of a person's identification papers, such as vehicle registration documents or a driver's license, longer than necessary to ascertain that everything is in order, and initiates further inquiry while holding on to the needed papers, a reasonable person would not feel free to depart." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997); *see also United States v. Lambert*, 46 F.3d 1064, 1068-69 (10th Cir. 1995) (consensual encounter converted to investigative detention when agents received the defendant's license and did not return it to him). An individual is seized within the meaning of the Fourth Amendment when an officer obtains and fails to return his driver's license and proceeds with an investigation. *Chan-Jimenez*, 125 F.3d at 1326. Such an action manifests an intent to restrain the individual's freedom, since he cannot "lawfully drive away without the documents." *Id*.

Where an officer retains an individual's driver's license for longer than necessary in order to confirm his identity, instructs him to remain by his vehicle while running a warrant check, and then takes the license back to his patrol car, a seizure within the meaning of the Fourth Amendment has occurred because no reasonable person would

feel free to leave. *United States v. Lopez*, 443 F.3d 1280, 1286 (10th Cir. 2006). Where an officer does not have probable cause or reasonable articulable suspicion to detain an individual until the warrant check was completed, the seizure violates the Fourth Amendment. *Id*.; *see also United States v. Martinez*, 203 F. App'x 757, 758 (9th Cir. 2006) (where officer testified at suppression hearing that he had no suspicion the defendant had engaged or was about to engage in criminal activity, the investigatory stop, which included retaining the defendant's identification and conducting a warrant check, violated the Fourth Amendment).

"A seizure 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Once an individual has been seized, the Fourth Amendment requires that "the length and scope of the detention be strictly tied to and justified by the circumstances which rendered its initiation permissible." *United States v. Contreras-Diaz*, 575 F.2d 740, 744 (9th Cir. 1978) (citing *Terry*, 392 U.S. at 19). "This standard permits a police officer to detain an individual stopped for [a crime] only the time necessary to obtain satisfactory identification from the violator and to execute a traffic citation." *Id*. Where the police officer completes these functions but continues to detain a defendant for the purpose of running a warrant check, without "reasonable grounds to be suspicious that there might be a warrant outstanding against him," the "continued detention is unreasonable" and its fruits are properly suppressed. *Id*.

**B. Applicable Law**

Considering the totality of the circumstances, the Court finds that Officer Resendiz detained Defendant without reasonable suspicion when he obtained Defendant's driver's license, ran a records check on the license, and then possibly failed to return it. Because this detention occurred without reasonable suspicion within the meaning of the Fourth Amendment, all evidence following from it must be suppressed.

As an initial matter, Officer Resendiz testified that he began to follow Defendant's

vehicle only because he had seen it multiple times in the preceding weeks. He testified that he lacked reasonable suspicion to conduct a traffic stop and that the vehicle did nothing that would have created reasonable suspicion for a stop. Furthermore, the parties agree that Officer Resendiz did not, in fact, stop Defendant's vehicle, and that the encounter between them that took place at the gas station was, at least up to a certain point, consensual. Because Officer Resendiz did not point to "specific and articulable facts" and accompanying "rational inferences" that would have supported a stop, nor did he articulate a "particularized and objective basis" for initiating a stop, the Court finds that no reasonable suspicion motivated Officer Resendiz's initial encounter with Defendant.

Although the Government argues to the contrary, contending that Resendiz had reasonable suspicion to stop the vehicle based on numerous factors (*see supra* at 6), the Court need not speculate about what a reasonable officer in Resendiz's position would have thought or done upon observing Defendant's vehicle. Resendiz testified that he did not have any reasonable suspicion for a traffic stop and followed the vehicle only because he had seen it before, and possibly because it had out-of-state plates registered to a rental car company. These facts alone do not constitute reasonable suspicion for a stop, even if using rental cars is a known tactic of alien smugglers. Resendiz did not testify that he developed reasonable suspicion that Defendant was engaging in alien smuggling or any other crime during the encounter—rather, he simply radioed for Border Patrol, presumably to allow the Border Patrol agents to investigate whether alien smuggling was occurring.

While awaiting Border Patrol's arrival, however, Officer Resendiz subjected Defendant to an unconstitutional seizure when he retained his driver's license to run a records check. Just like the defendants in *Chan-Jimenez*, *Lambert*, *Lopez*, and *Martinez*, Serna was detained within the meaning of the Fourth Amendment when Resendiz took his license and ran a records check on it. Those four cases unambiguously conclude that a consensual encounter is converted to a detention when an officer takes an individual's

license and retains it to run a records or warrant check without reasonable suspicion of a traffic violation or outstanding warrants. The Court agrees with the reasoning and application of the law as set forth in those cases. A reasonable person would not feel free to leave while a police officer was holding or retaining his driver's license. *See Chan-Jimenez*, 125 F.3d at 1326.

Here, Resendiz testified that he requested Serna's driver's license in order to confirm his identity. Resendiz could have done this by simply looking at the license and asking Serna to confirm his name and address. Had Resendiz done this and then immediately returned the license, no detention would have occurred. However, when Resendiz held the license and ran a records check on it, without reasonable suspicion to suspect Serna of a crime, the consensual encounter was converted into a detention. Of further import is Resendiz's testimony that he could not recall whether he stepped away from Serna's vehicle when he called dispatch to run the records check, or when exactly he returned the license to Serna. In light of this testimony and the facts as briefed by the parties, the Court concludes that Resendiz unlawfully detained Serna when he retained the license long enough to run the records check, and then for an indefinite amount of time beyond that. The fact that the results of the records check indicated that Serna's license was cancelled do not change the analysis because Resendiz lacked reasonable suspicion to run the check in the first place.

Furthermore, the results of the unconstitutional records check prolonged the detention in a way that further violated the Fourth Amendment. Resendiz testified that he did not write Serna a ticket for a cancelled license or begin taking steps to do so. If Resendiz did not intend to issue Defendant a citation for his cancelled license, he should have immediately returned the license and informed him that he was free to leave. According to the testimony, that is not what happened. To the extent that Resendiz retained Serna's license beyond the time necessary to complete whatever official business Resendiz intended—which, according to him, did not include issuing Serna a citation— an unconstitutional detention occurred. Furthermore, the detention was unconstitutionally

prolonged until Border Patrol arrived on the scene. For these reasons, the Motion to Suppress will be granted, and the evidence obtained as a result of the unlawful detention, including Border Patrol's arrest of Defendant, suppressed.

### C. Motion to Sever

On January 4, 2023, the Government filed a Superseding Indictment, adding one count of Possession of a Firearm and Ammunition by a Convicted Felon, based on the events of May 26, 2022. (Doc. 65.) Defendant filed a Motion to Sever Count Two of the Superseding Indictment. (Doc. 67.) Defendant requests that Count Two be severed because its inclusion would prejudice Defendant. (*Id.*) As the Motions to Suppress will be granted, the Motion to Sever has become moot and will be denied.

Accordingly,

**IT IS ORDERED** that the First Motion to Suppress 404(b) Evidence (Doc. 58) is **granted**.

**IT IS FURTHER ORDERED** that the First Motion to Suppress Evidence (Reasonable Suspicion) (Doc. 59) is **granted**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Sever Count 2 (Doc. 67) is **denied as moot**.

Dated this 10th day of February, 2023.

_____
Honorable Rosemary Márquez
United States District Judge